**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NICHOLAS SCHWAB, individually as son and Independent Administrator of the Estate of ALIVIA SCHWAB, deceased,<br><br>Plaintiff,<br><br>v.<br><br>MORRIS POLICE OFFICER NICHOLAS PAMPINELLA; MORRIS POLICE OFFICER CASIE PRICE; individually, and as employees/agents of the City of Morris; and THE CITY OF MORRIS, a Municipal Corporation,<br><br>Defendants. | ) | 23 C 16607 |

**MEMORANDUM OPINION**

**CHARLES P. KOCORAS, District Judge:**

This lawsuit arises from the fatal shooting of Alivia Schwab ("Schwab") by Morris Police Officer Nicholas Pampinella on September 29, 2023. Plaintiff Nicholas Schwab, as son and Independent Administrator of his mother's estate, brings claims under 42 U.S.C. § 1983 for excessive force and failure to intervene in violation of the Fourth Amendment, municipal liability under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), disability discrimination under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and related state law claims. Before the Court is the Motion for Summary Judgment filed by Defendants

Nicholas Pampinella ("Pampinella"), Casie Price ("Price"), and the City of Morris pursuant to Federal Rule of Civil Procedure 56.

To summarize the relevant events, Morris Police Officers Pampinella and Price responded to a call regarding a suicidal woman armed with a knife on September 29, 2023. Body camera footage, which is undisputed, shows that Schwab emerged from her apartment holding an eight-inch chef's knife and a cell phone. Over the following eighteen seconds, the officers commanded Schwab to drop the knife at least five times and to stop advancing at least seven times. Pampinella backed up approximately 38 feet as Schwab continued to advance approximately 64 feet. When Pampinella called for Price to deploy her taser, Schwab briefly glanced at Price, then turned back toward Pampinella and began running at him. When Schwab closed to approximately 13 feet—a distance she could cover in under two seconds—Pampinella fired, fatally striking Schwab.

Based on binding Seventh Circuit precedent establishing that deadly force is objectively reasonable when a person advances on an officer with a deadly weapon and ignores repeated commands to stop, the officers' actions do not rise to the level of a Fourth Amendment violation. *See King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). The *Monell* claim fails because there is no underlying constitutional violation. The ADA claim fails because Plaintiff cannot show that Officer Pampinella would have acted differently had Schwab not suffered from mental illness.

## BACKGROUND

In resolving a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts are taken from the record and are undisputed unless otherwise noted.

Schwab spent nearly seven years in mental health institutions before moving into her apartment at 1863 Ann Lane in Morris, Illinois, eight days before the September 29, 2023 incident. That morning, Schwab spoke with her ex-husband Brad, who was described as a trigger for her mental health issues. She then called the head of Bourbonnais Terrace, the mental health facility from which she had been discharged, and asked to return. A crisis counselor was directed to call Schwab. During that call, Schwab stated she was going to hurt herself. A co-worker called 911 while the counselor remained on the line with Schwab.

Shortly before 11:00 a.m., Officers Pampinella and Price responded to Schwab's apartment complex for a "code 7 attempt," meaning a suicide call. Dkt. # 88, ¶ 14. The dispatcher informed the officers that the subject had a knife in hand, was "cutting herself currently," and was "on the phone with her crisis [counselor]." *Id*. The officers' initial goal was to "talk her down" and ensure the scene was safe for the ambulance. *Id*. ¶¶ 16, 49.

Neither officer had previously encountered Schwab. They arrived almost simultaneously and parked down the street. As they approached Schwab's unit on foot,

they observed her standing in her doorway holding a cell phone in one hand and an eight-inch chef's knife in the other. Pampinella drew his firearm and said, "Miss, Miss, drop the knife." *Id.* ¶ 22. Schwab began silently walking toward Pampinella, who repeated his command in a louder voice and began backing up.

Over the next eighteen seconds, the officers commanded Schwab to drop the knife five times and to stop coming toward them seven times. Schwab never responded verbally or complied with any command. She held the knife between shoulder at chest height, tip down, arm partially bent, and continued advancing. Pampinella backed up approximately 38 feet as Schwab advanced approximately 64 feet.

As Schwab continued to advance, Pampinella yelled to Price to "tase her." *Id.* ¶ 47. Schwab glanced at Price, who was drawing her taser, then turned back toward Pampinella and began running directly at him. She was moving approximately twice as fast as Pampinella could backpedal. When Schwab closed to approximately 13 feet—a distance she could cover in under two seconds—Pampinella fired four shots, fatally striking Schwab.

Neither officer had been previously disciplined or sued for any use of force incident. Earlier in 2023, Chief of Police Steffes had transferred Pampinella to the night shift, reduced his responsibilities, and assigned him to a specific sergeant due to personality conflicts with other first responders. Chief Steffes believed those personality issues had been resolved when she transferred Pampinella back to the day shift approximately one month before the incident.

The operative complaint asserts three federal counts. Count I alleges Fourth Amendment violations under Section 1983 for excessive force against Pampinella and failure to intervene against Price. Counts IV and V, respectively, assert violations under *Monell* and the ADA against the City of Morris. The remaining state law counts assert claims for wrongful death (Count II), survival (Count III), and indemnification (Count VI). Defendants now move for summary judgment on all the federal claims and request dismissal of the pendent state law claims.

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cnty.*, 752 F.3d 708, 712 (7th Cir. 2014) (internal quotations omitted). In deciding whether a dispute exists, the courts "must construe all facts and reasonable inferences in favor of the nonmoving party." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1074 (7th Cir. 2016). Where key events are captured on video, courts must view "the facts in the light depicted" in the footage, *Scott v. Harris*, 550 U.S. 372, 380–81 (2007), and may not "indulge stories clearly contradicted by" the video evidence, *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018).

## DISCUSSION

Plaintiff brings claims under Section 1983 for excessive force against Pampinella and failure to intervene against Price, a *Monell* claim, an ADA claim, and state law claims for wrongful death, survival, and indemnification. The Court addresses each claim in turn.

### I. Excessive Force

Whether a law enforcement officer's use of deadly force constitutes a Fourth Amendment violation is an objective inquiry that is evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "[T]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396–97. "This is true even when, judged with the benefit of hindsight, the officers may have made some mistakes." *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 612 (2015) (internal quotations omitted).

"[T]he level of force that is constitutionally permissible in dealing with a mentally ill person 'differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community.'" *King*, 954 F.3d at 984 (quoting *Gray v. Cummings*, 917 F.3d 1, 11 (1st Cir. 2019)). Therefore, "a subject's mental illness is a factor that a police officer must

take into account in determining what degree of force, if any, is appropriate." *Id.* (internal quotations omitted). The Seventh Circuit has agreed "that officers often should approach persons known or suspected to have a mental-health problem differently from the way they handle those whom they suspect of criminal activity." *Id.*

But even accounting for a subject's mental illness, "[w]hen addressing the use of deadly force, the court considers whether a reasonable officer in the circumstances would have probable cause to believe that the person poses an immediate threat to the safety of the officers or others." *Id.* at 985 (citation modified) (quoting *Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018). "If the person of interest threatens the officer with a weapon, deadly force may be used, because the risk of serious physical harm to the officer has been shown." *Id.* This applies even when "a less deadly alternative is available to the officers" under the circumstances. *Id.* (citing *Plakas v. Drinski*, 19 F.3d 1143, 1149 (7th Cir. 1994)). "And this is so whether or not the targeted person suffers from a mental illness—the critical consideration is whether he or she poses an immediate threat to the officers or others." *Id.*

*King* is closely analogous. There, Bradley King, a 29-year-old who suffered from paranoid schizophrenia, called 911 and requested help during a mental health crisis. *Id.* at 983. Two deputies responded to perform a welfare check. *Id.* Upon their arrival, Bradley came out of the house, walked toward the deputies, and pulled a ten-inch knife from his pocket. *Id.* The officers "backpedaled, drew their service firearms, and yelled at Bradley to stop and drop the knife." *Id.* Bradley disregarded these

commands, raised the knife with the blade pointing toward the deputies, and started running at one of them. *Id*. When Bradley was eight feet away from him, the deputy fired one fatal shot. *Id*. The Seventh Circuit affirmed summary judgment for the deputies, holding that the use of deadly force was "constitutionally reasonable." *Id*. at 985.

The facts here are materially indistinguishable—indeed, if anything, the circumstances in this case present a stronger case for the officers. The undisputed body camera footage shows that Schwab advanced toward Pampinella holding an eight-inch knife, ignored at least ten commands to either drop the knife or stop advancing, and then began running at Pampinella when she was approximately thirteen feet away. Unlike in *King*, where the court had to evaluate the officers' testimony without video corroboration, this case has body camera footage that establishes the critical events beyond dispute. And unlike the plaintiff in *King*, who argued the officers "planted the knife" and "fabricated the story" about the decedent charging, *id*. at 985, here the video forecloses any such argument.

Plaintiff attempts to distinguish *King* by arguing that Schwab never pointed the knife at the officers and held it pointed downward throughout the encounter. This is a distinction without legal significance. In *King*, the decedent "raised" the knife "in front of him so that the blade was pointing toward the officers" before charging. *Id*. at 983. But the *King* court's holding did not turn on the precise angle of the blade. A knife with the tip down, held at or above waist height in front of the body—as the video shows

Schwab held it—can maim or kill regardless of the blade's orientation. The Court declines to adopt a rule that would require officers, in the seconds before a potential attack, to parse the geometric angle of a knife before defending themselves.

Plaintiff emphasizes that Schwab was mentally ill, physically small, wearing pajamas and slippers, and on the phone with her counselor. But as *King* makes clear, while "a subject's mental illness is a factor that a police officer must take into account," the dispositive question is "whether he or she poses an immediate threat to the officers or others." *Id*. at 984–85. In *King*, Bradley suffered from paranoid schizophrenia and was experiencing a mental health crisis—yet the *King* court found the use of deadly force reasonable. *Id*. at 985.

Plaintiff's expert conceded that "due to the unpredictable nature of some persons in crisis, officers must be particularly conscious of their own safety when dealing with individuals in crisis." Dkt. # 88, ¶ 70. As *King* observed, the plaintiff's "broad assertion that [the decedent] did not generally show an inclination toward violence does not negate the evidence that he behaved violently in this instance." 954 F.3d at 986. The same logic applies here. Whatever Schwab's general disposition, the video establishes that on September 29, 2023, she advanced on Officer Pampinella with a knife, ignored repeated commands, and then ran at him.

Plaintiff argues that Price's decision not to use force demonstrates that Schwab did not pose an imminent threat. *King* squarely rejected this argument. There, too, only one of the two officers fired. The *King* court explained that "[f]rom Thomas's failure

to shoot we can reasonably infer that Thomas did not view [the decedent] as posing an imminent threat to him; we cannot, however, reasonably infer that [the decedent] did not pose an imminent threat to Hays." *Id.* at 986. "[I]t makes sense that Hays, not Thomas, would decide it was necessary to use his firearm in self-defense" because the decedent "charged at Hays, not Thomas." *Id.* at 986–87. Here, Schwab ran at Pampinella, not Price. The fact that Price did not use force says nothing about whether Pampinella reasonably perceived an imminent threat to himself.

Relying on *Barnes v. Felix*, 605 U.S. 73 (2025), Plaintiff argues the Court must consider Pampinella's pre-shooting conduct, including his failure to use available cover and his alleged escalation of the situation. *Barnes* held only that the "totality of the circumstances" test has no inherent time limit—something the Seventh Circuit has long recognized. 605 U.S. at 83; *see also, e.g.*, *Williams v. Indiana State Police Dep't*, 797 F.3d 468, 473 (7th Cir. 2015) (recognizing that "the reasonableness inquiry is an objective one, which examines whether the officer's actions are objectively reasonable in light of the totality of the facts and circumstances confronting him or her, without regard for consideration of the officer's subjective intent"). Critically, *Barnes* expressly declined to address "whether or how an officer's own creation of a dangerous situation factors into the reasonableness analysis." *Barnes*, 605 U.S. at 83 (internal quotation omitted).

As the Seventh Circuit explained, "officers who make errors that lead to a dangerous situation retain the ability to defend themselves." *Gysan v. Francisko*, 965

F.3d 567, 569–70 (7th Cir. 2020). *King* itself acknowledged this principle, noting that the reasonableness calculus applies "even when, judged with the benefit of hindsight, the officers may have made 'some mistakes.'" 954 F.3d at 984 (quoting *Sheehan*, 575 U.S. at 612). Here, Pampinella backed up approximately 38 feet, gave at least ten commands, and called for Price to use her taser before Schwab began running at him. These actions do not rise to the level of a Fourth Amendment violation. *See Plakas*, 19 F.3d at 1149 ("The Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternatives"). Here, Pampinella's use of force was objectively reasonable. The Court therefore grants Defendants' motion for summary judgment on the Section 1983 claim against Pampinella.

## II. Failure to Intervene

As to Price, in order for there to be a viable failure-to-intervene claim, "it logically follows that there must exist an underlying constitutional violation." *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) (Eighth Amendment failure to intervene context); *see also Montoya v. City of Chicago*, 2022 WL 523105, at *2 (N.D. Ill. 2022) (finding that "[a]bsent the Fourth Amendment excessive force claim against [Officer] Krzeptowski," the plaintiff's failure-to-intervene "claim[] cannot proceed" against Officer Kuta for "[his] fail[ure] to intervene to stop Krzeptowski from using excessive force against [the decedent]"). As explained above, Pampinella's use of force was not a constitutional violation. Accordingly, the Court grants Defendants' motion for summary judgment on the Section 1983 claim against Price.

## III. Qualified Immunity

"[O]fficers are entitled to qualified immunity under [Section] 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *See D.C. v. Wesby*, 583 U.S. 48, 62–63 (2018) (internal quotations and citation omitted). Because the Court finds no constitutional violations as to Plaintiff's Fourth Amendment claims, it need not address qualified immunity. *See King*, 954 F.3d at 987 ("In light of our ruling on the merits, we have no need to address [the officer's] back-up assertion that he was entitled to qualified immunity.").

## IV. Monell

Plaintiff's *Monell* claim against the City of Morris fails to withstand summary judgment. "If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *see also King*, 954 F.3d at 987 ("[I]t is premature for us to delve into the question of municipal liability until we are satisfied that a constitutional violation has been alleged and properly supported."). Because the officers did not violate Schwab's constitutional rights, the City cannot be liable. *See Doxtator v. O'Brien*, 39 F.4th 852, 864 (7th Cir. 2022) ("Because we affirm the dismissal of the [Section] 1983 claim against O'Brien, we also affirm the dismissal of the failure-to-train and *Monell* claims the City of Green Bay and Chief Smith.").

Accordingly, the Court grants Defendants' motion for summary judgment on the *Monell* claim.

**V. ADA**

Whether Title II of the ADA applies to law enforcement investigations and arrests, and if so to what extent, remains "an open question" in the Seventh Circuit. *King*, 954 F.3d at 988. In *King*, the Seventh Circuit "assume[d] without deciding that Title II applies to the officers' interaction" with the mentally ill decedent. 954 F.3d at 989. The *King* court likewise assumed the county "could be held vicariously liable under Title II" and that "deliberate indifference" was the appropriate standard. *Id.*; *see also Culp v. Caudill*, 140 F.4th 938 at 942–43 (7th Cir. 2025) (assuming without deciding that Title II applies to on-the-street police activity and applying the deliberate indifference standard in *King*).

Assuming Title II applies, Plaintiff's claim nonetheless fails. To prevail, Plaintiff must show that "'but for' [the decedent's] disability, [she] would have been able to access the services or benefits desired." *King*, 954 F.3d at 989. As the Seventh Circuit explained in *King*, "there is no competent evidence contradicting [the deputy's] account that he shot [the decedent] because [the decedent] ran at him with a knife. We have been given no reason to believe that [the deputy's] response would have been different had someone not suffering from a mental illness done the same thing." *Id.* The same is true here. The undisputed body camera footage shows that Pampinella shot Schwab because she ran at him with a knife after ignoring repeated commands to stop.

There is no evidence that Pampinella would have acted differently had someone without a mental illness engaged in the same conduct.

The *King* court observed that the officer's "failure to disarm, or take the decedent under control, was not because he was inadequately trained to deal with disabled individuals, but because the decedent threatened him with a deadly weapon before he could subdue him." *Id*. (quoting *Thompson v. Williamson Cnty., Tenn.*, 219 F.3d 555, 558 (6th Cir. 2000). Therefore, if Schwab was in fact denied access to medical services, "it was because of [her] violent, threatening behavior, not because [she] was mentally disabled." *Id*. (internal quotation and citation omitted). The same analysis applies here. Schwab's death resulted from her decision to run at Pampinella with a knife, not from any failure to accommodate her disability. The ADA claim fails. The Court therefore grants Defendants' motion for summary judgment on this claim.

## VI. State Law Claims

Because the Court grants summary judgment on Plaintiff's federal claims, the Court does not have subject matter jurisdiction and thus declines to exercise its supplemental jurisdiction over Plaintiff's state law claims. 28 U.S.C. § 1367(c)(3). ("The district courts may decline to exercise supplemental jurisdiction [if] the district court has dismissed all claims over which it has original jurisdiction."); *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment [80] as to Plaintiff's Section 1983, *Monell*, and ADA claims and declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. Judgment is entered in favor of Defendants on Counts I, IV and V of Plaintiff's First Amended Complaint. Civil case terminated.

It is so ordered.

Dated: January 16, 2026

Charles P. Kocoras
Charles P. Kocoras
United States District Judge